IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENWOOD DIVISION

| | |
|---|---|
| Shelia S. Myers,<br><br>       Plaintiff,<br><br>vs.<br><br>Saluda County School District,<br><br>       Defendant. | Civil Action No. 8:08-2976-RBH-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This matter is before the court on the defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (doc. 47). In her complaint, the plaintiff alleges the defendant, her current employer, racially discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, and violated her First Amendment rights.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

**FACTS PRESENTED**

The plaintiff, who is a black female, has been employed by the District for approximately 28 years (pl. dep. 173). She began her employment with the defendant as a teacher's assistant (pl. dep. 173). In 1997, the plaintiff was promoted to Director of Federal Programs for Students and continued in that position through the 1998-1999 school year (pl. dep. 92-93). In 1999, she became the Senior Executive for Pupil Services and Human Resources, a dual role (pl. dep. 13-14, ex. 16). The plaintiff continued to occupy the dual role until the 2002-2003 year when the duties were separated, and the human resources duties were given to the person who was previously the Secretary for Personnel, Janet Sample (pl. dep. 14; Janet Sample dep. 11). For the 2008-2009 school year, the

plaintiff was reassigned to the Saluda Opportunity Academy, also known as the alternative school, a reassignment she did not request (pl. dep. 78). She currently holds the position of Director of Saluda Opportunity Academy (pl. dep. 8). The plaintiff makes approximately $1,000 more per year in her current position than she did in her last position (pl. dep. 78). With regard to her new position, the plaintiff testified as follows in her deposition:

> Q: When you became the Director of the Saluda Opportunity Academy, the position you currently occupy, did your pay increase?
>
> A: Yes.
>
> Q: You were placed in that position by Dr. Stone?
>
> A: Yes.
>
> Q: Do you like the position you're in better than the one you occupied as administrator or Director for Student Services?
>
> A: I don't know if I like it "better." There's not as much stress related to this position as the other one.

(Pl. dep. 164-65).

Under Dr. Nelson Perry, Superintendent of the District from July 1998 to April 2002, the plaintiff enjoyed a good working relationship with her superior (Nelson Perry dep. 7; pl. dep. 115). The plaintiff considered Dr. Perry to be "fair and considerate" (pl. dep. 114-15). The plaintiff received a good performance evaluation from Dr. Perry in 2002, her last evaluation (pl. dep. 110; Perry dep. 20). Dr. Perry informed the plaintiff, however, that several District board members did not approve of her handling of personnel while she served in her dual role (Perry dep. 16). Board members claimed that the plaintiff sent them applications only of black applicants, which concerned Dr. Perry because they had very few black applicants in Saluda (Perry dep. 16). Dr. Perry testified that it was not unusual for the plaintiff to forward to the board the applicants she felt were the best candidates and that she gave the principals the opportunity to review all of the applications (Perry dep. 16). Several District board members indicated to Dr. Perry that the plaintiff should not be

2

Director of Human Resources because she was going to favor black applicants because she is black (Perry dep. 18). The plaintiff's job was not to hire applicants, as she did not have the authority to do so; her job was to accept the applications and forward them to the board (Perry dep. 16, 18). Dr. Perry investigated the matter and found that applications were forwarded based on qualifications, not race (Perry dep. 63-64). Principals expressed to Dr. Perry a concern that the plaintiff was concerned about only black special education students, but Dr. Perry saw no indication of that and could not verify their concerns (Perry dep. 16). None of the board members or principals who complained about the plaintiff were a minority (Perry dep. 21). Dr. Perry testified that the plaintiff performed "very well" in her position as Personnel Director (Perry dep. 20).

District Board Chairman Ben Harrison gave Dr. Perry a list of people with whom the board was concerned (Perry dep. 52-53, ex. 5; pl. dep. 34-35). As the plaintiff and Dr. Perry described the list, it was a "hit list" of people the board wanted "to get rid of" without getting into legal trouble (pl. dep. 36; Perry dep. 56-58). The handwritten list, drafted by Chairman Harrison, specifically asks, "How do we address those personnel issues without getting into legal trouble?" (Perry dep., ex. 5; pl. resp. m.s.j., ex. H, docs. 000378-000380). Dr. Perry interpreted this as "how do you get rid of them?" (Perry dep. 55-56, 58). All five of the employees listed on the list on the left side of the page are minorities and all are individuals about whom several board members expressed concerns (Perry dep. 56, ex. 5). The list on the right of the handwritten page is a list of employees about whom board member Kathy Coleman specifically had concerns (Perry dep. 56). Dr. Perry further testified that he believed that the removal of the plaintiff from her personnel position after he left the District "was because of not who she is, but because of her race" (Perry dep. 20).

Dr. Tanzella Gaither, who is a black female and whose name also appeared on what she also termed as the "hit list," resigned shortly after Dr. Perry left the District

3

because she believed she was being racially discriminated against and resigned her employment before "they would ask me to leave, based on the fact of the way I was treated" (Tanzella Gaither dep. 14, 19).

Dr. Joe Brooks, interim superintendent replacing Dr. Perry, was replaced by Dr. Pete Stone in 2002 (Sample dep. 11). Dr. Stone made Janet Sample's promotion to Director of Human Resources (Personnel) permanent (Sample dep. 11). Prior to the personnel duties being removed from the plaintiff, Dr. Stone informed Otis J. Freeman, that the "school board wanted to remove [the plaintiff] from the Personnel Department because she did not perform adequately as a personnel director and too many African-Americans were being hired. He was against this because there was no documentation to validate her dismissal." Mr. Freeman began his employment with the District during the 2002-2003 school year as a principal. He formerly worked with Dr. Stone in North Carolina. He stated that "[w]ithin the first month of coming to Saluda County School District, the only comments I heard about [the plaintiff] were negative. I would told by various persons that [the plaintiff] was very difficult to work with, that you could not get [the plaintiff] to do what you needed her to do, and that she was incompetent." Mr. Freeman's opinion of the plaintiff was tainted by this influx of negativity. However, his opinion changed once he got to know the plaintiff. Mr. Freeman learned that the plaintiff's concern was in following proper procedure and that she "tried to do what was right for the children enrolled in Saluda County schools." Mr. Freeman then began to support the plaintiff, thus invoking the ire of Dr. Stone. Dr. Stone questioned Mr. Freeman on various occasions on why he supported the plaintiff (Otis J. Freeman aff. ¶¶ 5-9).

In her duties as Director of Student Services (or Pupil Services, as it was previously known), the plaintiff was responsible for ensuring the District complied with federal and state laws concerning special education, including ensuring special education students were evaluated properly, each student's individualized education program ("IEP")

4

was followed, and federal funding received by the District was utilized properly (pl. dep. 16-17, ex. 1). Her attempts to do so drew criticism and disdain from Dr. Stone and Dr. David Eubanks, who was contacted by Dr. Stone and ultimately retained by the District to serve as a financial consultant in 2002, and who began visiting the District in early 2003 (David Eubanks dep. 9-10). Dr. Eubanks accused the plaintiff of the IDEA and Medicaid budgets not balancing, when she did not set the budget (pl. dep. 41-42, 46). After Dr. Eubanks' arrival, the District had a maintenance of effort problem with the State Department of Education with regards to students' IEPs (pl. dep. 44). The plaintiff claims this was caused by Drs. Stone and Eubanks funding employees' salaries out of the federal money earmarked for IDEA, thus leaving little money for student services required under students' IEPs (pl. dep. 44; Freeman aff. ¶ 10). Dr. Stone did not like the fact that the plaintiff stood up to him with regard to the District's improper use of federal money because it cost the District money (Freeman aff. ¶ 10). As the plaintiff described it, "Federal monies like IDEA and federal money like preschools coming in are a supplement to help supplement the cost of these students" (pl. dep. 44). IEPs must be funded before anyone's salary is paid out of the federal money; "the purpose of IDEA money, is to supplement, not to supplant" (pl. dep. 84).

The plaintiff claims she was further blamed when the Medicaid budget did not balance (pl. dep. 46). Medicaid money is not guaranteed from one year to the next (pl. dep. 45-46; Eubanks dep. 83-84). Despite this, Dr. Eubanks added employees' salaries to Medicaid to have a general fund balance (pl. dep. 45). When Medicaid did not balance, Drs. Stone and Eubanks and Tammie Shore, Assistant Superintendent/Superintendent in Training, blamed the plaintiff because it was under her office and should balance (pl. dep. 46; Sample dep. 46).

The plaintiff supported Dr. Gaither when she filed a race discrimination charge against the District. The plaintiff was listed as a witness for Gaither (pl. dep. 55).

5

While she was never called to testify, the plaintiff was questioned by the District's attorney (pl. dep. 55, 70-71).

During Dr. Stone's tenure, the plaintiff claims she was excluded from meetings and interviews, had duties removed, and ultimately was reassigned. She claims she was excluded from at least two meetings that she should have attended. In one meeting, during which staff development was to be discussed, notice was emailed to all of the administrators, including principals, to attend the meeting. However, the plaintiff's name was excluded from the notice email (pl. dep. 143-46). The plaintiff claims Dr. Stone's secretary later informed her that Dr. Stone did not tell her to include the plaintiff on the notice (pl. dep. 145). The plaintiff learned of the meeting from a principal right before the meeting was to occur (pl. dep. 143-44). She immediately attempted to contact Superintendent-in-Training Tammie Shore about whether she needed to attend the meeting (pl. dep. 144). Ms. Shore received and read the email before the meeting began but did not respond to the plaintiff' question of whether she needed to attend (pl. dep. 144). Ms. Shore later told the plaintiff that the plaintiff not receiving notice was an oversight (pl. dep. 134).

While the plaintiff no longer had the personnel duties, she was told that interviewing and making recommendations regarding contracted persons was her responsibility (pl. dep. 40-41; Sample dep. 44, ex. 1). However, when the time came to interview a contracted school psychologist, the plaintiff was not on the interview team (pl. dep. 40-41, 169; Sample dep. 44). The interview was done by Superintendent-in-Training Shore and Ms. Sample (pl. dep. 40-41, 169; Sample dep. 44).

The plaintiff claims she also had duties removed without prior notification. The plaintiff was told in front of colleagues that she no longer had the responsibility for residency and homelessness. She claims Ms. Shore took over those responsibilities except when it became audit time and Ms. Shore wanted to push the responsibilities back onto her

6

(pl. dep. 37-38, 127, 129-131). The plaintiff refused because the program was in disarray, and she was not going to take responsibility for Ms. Shore's mismanagement (pl. dep. 127, 129-31).

Shortly before his departure from the District, Dr. Stone reassigned the plaintiff to the alternative school (Sample dep. 71). The alternative school was known as the "graveyard" and was seen as a place employees were sent to be punished (Gaither dep. 44-45; pl. dep. 77-78). The plaintiff claims that sending employees to the "elephant's burying ground" was done to force them out when the superintendent wanted the employee gone (pl. dep. 77-78). The plaintiff testified that she sat in on meetings where it was stated that to get rid of employees, send them to the alternative school. This was done to both Dr. Gaither and the plaintiff (pl. dep. 78; Gaither dep. 46). Dr. Gaither left the District shortly after Dr. Stone's tenure began (Gaither dep. 38). The plaintiff claims that she has dramatically changed the perception of the alternative school and is thriving at the school as she was at the District office (pl. dep. 156-58; Sample Dep. 66-68, 71). The plaintiff's salary was frozen after Dr. Stone became superintendent of the District and remained so for four years. The plaintiff recently learned that she would not receive a salary increase this year, as well, as the District has moved to a new salary schedule for administrators by placing all administrators on the teachers' salary schedule (Angela L.P. Hite dep., ex. 5; Sample dep., ex. 4). Dr. Mathis, the current Superintendent of the District, made the decision with school board approval to voluntarily place all administrators on the schedule that the State mandates for teachers (Sample dep. 18-19, 81). As the plaintiff was informed, she has "maxed out" on the teachers' salary schedule because of her years of experience, though she receives a supplement from the District (Hite dep. 37; Sample dep. 51-53). The criteria for the supplement is subjective and solely within the discretion of the superintendent, as it has been for years. (Sample dep. 63-64). The new supplement schedule allows administrators to receive a supplement of up to $5000. However, the

plaintiff's replacement as the Director of Special Services, a black male hired by Dr. Stone, receives a supplement of $20,000 (Sample dep. 56, 68-69; pl. dep. 160).

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id*. at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the non movant and in favor of the non moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. V. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id*. At 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's

8

positions is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Accordingly, when rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at trial on the merits.

## **ANALYSIS**

### *Title VII Race Discrimination*

The plaintiff may establish a claim of race discrimination in either of two ways: (1) by "'using any direct or indirect evidence relevant to and sufficiently probative'" of discriminatory purpose, or (2) by using the burden-shifting approach outlined in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *Rhoads v. FDIC*, 257 F.3d 373, 391-92 (4th Cir. 2001) (quoting *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 606-07 (4th Cir.1999)). Here, the plaintiff is proceeding under the *McDonnell Douglas* burden-shifting scheme.

Generally, to establish a *prima facie* case of race discrimination under Title VII, the plaintiff must show: (1) is a member of a protected class; (2) was subject to an

9

adverse employment action; and (3) the adverse employment action occurred under circumstances that raise a reasonable inference of unlawful discrimination. *See e.g., McDonnell Douglas Corp.*, 411 U.S. at 802; *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218-19 (4th Cir. 2007).

Here, the plaintiff alleges the defendant discriminated against her because of her race in that her salary was not increased for four years during her employment with the District. She also alleges that she recently learned that she also would not receive a salary increase for the 2009-2010 school year (Hite dep. 35-37, ex. 5). The plaintiff also claims that she was excluded from meetings and interviews that concerned matters under her job responsibilities; she was blamed for problems that were not within her control; she had job duties removed; she was the only administrator who was required to have another administrator sign off on contracts for which she was responsible (*see* Sample dep., ex. 1, Bates Stamp 000056); and she was reassigned to the alternative school, which the plaintiff alleges was used by the District as a means of punishment.

The plaintiff has presented evidence that the alleged adverse employment actions occurred under circumstances giving rise to an inference of discrimination. The handwritten list drafted by Chairman Harrison, referred to as a "hit list" by the plaintiff, specifically asks, "How do we address those personnel issues without getting into legal trouble?" (Perry dep., ex. 5; pl. resp. m.s.j., ex. H, docs. 000378-000380). Dr. Perry interpreted this as "how do you get rid of them?" (Perry dep. 55-56, 58). All five of the employees listed on the left list are minorities and were all individuals with whom several board members expressed concerns (Perry dep. 56, ex. 5). The plaintiff's name was second on the list. First on the list was Dr. Gaither, who ultimately filed race discrimination charges against the District (Gaither dep. 22). Shortly after the list was given to Dr. Perry by the board chairman and Dr. Perry refused to get rid of the employees, Dr. Perry was removed from his position. Dr. Stone was then named Superintendent, and shortly thereafter he removed the plaintiff from her personnel position. Dr. Perry testified that he

10

believed the removal of the plaintiff from her personnel position after he left the District "was because of not who she is, but because of her race" (Perry dep. 20). Shortly before his departure from the District, Dr. Stone reassigned the plaintiff to the alternative school, which the plaintiff claims was to get rid of her.

Viewing all of the evidence in a light most favorable to the plaintiff, as this court must, the plaintiff has succeeded in proving a *prima facie* case. Accordingly, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for its actions, and if the defendant carries this burden, the plaintiff must then establish by a preponderance of the evidence that the reason articulated by the employer is a pretext to mask unlawful discrimination. *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas Corp v. Percy Green*, 411 U.S. 792, 802-03 (1973)).

The defendant claims that the plaintiff's salary was frozen due to budgetary constraints and notes that numerous administrators, all of whom are white, also did not receive salary increases during the pertinent time period (def. m.s.j. 7-14).

The plaintiff argues in response as follows:

Teachers and administrators may receive a supplementary salary provided by the District. ( Hite Dep. 25-26). While teachers receive a set percentage, administrators were placed on the supplement scale solely at Dr. Stone's discretion. (Sample Dep. 63; Hite Dep. 26). No objective criteria was used in giving an administrator a salary supplement. (Sample Dep. 63). Sample testified that now, under Dr. Mathis's administration, they still take an administrator's experience into consideration and begin people at the lower end of the newly created administrator's salary supplement scale to allow an administrator room to improve. (Sample Dep. 63). Despite this move to allowing an administrator "room to improve," [the plaintiff's] salary and supplemental salary have remained the same. [The plaintiff] was placed at the supplement range "years ago so it hasn't changed," other than being given $1000 when she was reassigned to the alternative school. (Sample Dep. 65). [Tammie Shore, Assistant Superintendent/Superintendent in Training], Caucasian, despite asking to be reassigned back to a school and

11

> withdrawing her name from being considered for superintendent, continued to receive her salary of $93,348 for up to two years. (Sample Dep. 60). It was not until Dr. Mathis came and Shore's salary was brought to his attention that her salary was put on the administrator's salary and supplemental scales. (Sample Dep. 59). However, Shore continues to receive a salary supplement at the top of the stated scale, despite the move to allow people room to improve. (Sample Dep. 58). The stated reason was because of Shore's experience[,] but [the plaintiff] has 28 years of experience in the District[,] and her salary supplement has remained the same for many years.

(Pl. resp. m.s.j. 16-17).

The plaintiff also notes that the person who was initially assigned to the alternative school received a $20,000 supplement from Dr. Stone, which "[f]or a school district that cannot afford to give an administrator an increase, . . . seems excessive" (pl. resp. m.s.j. 17). As further evidence of pretext, the plaintiff argues: "School board members told Drs. Perry and Stone that [the plaintiff] hired too many African-Americans and they felt that she only forwarded African-American applicants. However, once Sample, Caucasian, became Director of Personnel, they told her to make an effort to hire more minorities. (Sample Dep. 32). Criticizing an African-American administrator for allegedly doing the very thing you then direct a Caucasian administrator to do is clear evidence of pretext" (pl. resp. m.s.j. 18).

Based upon the foregoing, this court finds that a reasonable factfinder could determine that the defendant discriminated against the plaintiff because of her race. Accordingly, summary judgment should be denied on this claim.

***Title VII Retaliation***

The plaintiff claims the defendant retaliated against her because she was named as a witness in Dr. Gaither's EEOC claim, and she was interviewed by the District's attorney with regard to the claim. The Fourth Circuit Court of Appeals has held that the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

12

802 (1973), also applies in analyzing retaliation claims under Title VII. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir. 2000). Pursuant to the *McDonnell Douglas* burden-shifting analysis, to establish her retaliation claim, a plaintiff must first establish a *prima facie* case by showing that (1) she engaged in a protected activity, (2) the employer took adverse employment action against her, and (3) her protected activity was causally connected to some adverse employment action. *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001) (citing *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). If the employer can state legitimate, non-retaliatory reasons for the adverse employment action, the plaintiff must produce evidence establishing that the employer's stated reasons for the adverse action were mere pretext for unlawful retaliation. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-49 (2000).

Under our precedent, it is clear that acting as a witness in a Title VII claim is protected activity. *Brockman v. Snow*, 217 Fed. Appx. 201, 206 (4th Cir. 2007) (citing *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir.1998) ("Activities that constitute participation are ... (1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII.")).

Here, the plaintiff relies upon the same adverse employment actions described above: her salary was frozen for four years, job duties were removed from her, she was excluded from staff meetings, she was required to report to Shore when other administrators were not, she was reassigned to the alternative school, and she "suffered other indignities" (pl. resp. m.s.j. 20). Assuming without deciding that these constitute adverse employment actions against her, the plaintiff has offered absolutely no evidence that the fact she was a witness for Dr. Gaither was causally connected to these actions.

In her deposition, the plaintiff testified as follows:

Q: You mention you felt like you were retaliated against. Do you have any evidence that anyone with the District retaliated against you because of your participation in the Gaither matter?

13

> A: I do believe that's why my salary was frozen, as part of that, yes and a part of this list. Yes.
>
> Q: I understand that is your belief. My question is, do you have any evidence?
>
> A: Yes. My salary was frozen.
>
> Q: Let me get my question out. I understand you've got a belief that your salary was frozen because of the Gaither matter and your being a potential witness in that - -
>
> A: And on the hit list.
>
> Q: I get all that. My question is, do you have any evidence that occurred out of retaliation for the Gaither matter?
>
> A: I don't have any evidence that it didn't, either. That's my belief.

(Pl. dep. 140-41).

In regard to the causal connection requirement of the *prima facie* case, the plaintiff argues as follows:

> A causal connection between these acts exists. The wheels were set in motion with the "hit list" of names of employees the District's school board complained of, drafted by Harrison. After Dr. Perry refused to do as the school board wished and "get rid" of the employees, he was replaced and Dr. Stone came to the District. With Dr. Stone's hiring, Myers' salary was frozen and the other actions detailed above began to occur. These retaliatory actions occurred for several years culminating with Myers' assignment to the alternative school. Simply because the District was not successful in forcing Myers to quit does not mean, nor is it evidence, that the retaliation did not occur.

(Pl. resp. m.s.j. 17).

"The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close' . . . ." *Clarke County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2002)

14

(citing *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir.1992) (4-month period insufficient)). Here, the plaintiff has failed to come forward with any evidence showing a "very close" temporal proximity between her alleged protected activity and the alleged adverse employment actions, and she has no other evidence supporting a causal connection between them. Based upon the foregoing, summary judgment should be granted on this cause of action.

### *First Amendment*

In the last paragraph of the motion for summary judgment, the defendant stated, "For the reasons stated above and based upon the record before this Court, no evidence exists to show that the Defendant is liable for a constitutional violation of the rights of the Plaintiff, including but not limited to the Plaintiff's rights under the First Amendment" (def. m.s.j. 20). This is the defendant's only reference to the First Amendment claim in its motion for summary judgment. The plaintiff, in her opposition to the motion for summary judgment, did not include any response regarding the First Amendment claim, noting that the defendant did not address it "except as to make a conclusory statement in its conclusion section" (pl. resp. 1 n.1). In its reply, the defendant stated:

> In order to establish a violation of First Amendment rights, the Plaintiff must prove retaliatory employment action. *See Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3rd 292 (4th Cir. 2006). The Defendant did not retaliate against the Plaintiff. The Defendant, in fully addressing the Plaintiff's retaliation claim, necessarily addressed her First Amendment rights claim. The evidence is insufficient for the Plaintiff to prove either as a matter of law.

(Def. reply 5).

"In order to prevail on a First Amendment retaliation claim, the plaintiff must show that (1) she engaged in protected expression regarding a matter of public concern; (2) her interest in First Amendment expression outweighs her employer's interests in

15

efficient operation of the workplace; (3) she was deprived of some valuable benefit; and (4) a causal relationship exists between her protected expression on matters of public concern and the loss of the benefit. *Peters v. Jenny*, 327 F.3d 307, 322 (4th Cir. 2003).

The plaintiff contends that she opposed the defendant in its attempts to misuse federal IDEA and Medicaid money and refused Dr. Stone's order to violate a parent's rights under IDEA. The plaintiff further alleges that Dr. Stone ordered her not to tell parents that they have due process rights if they do not agree with their child's IEP (pl. dep. 131-32). While it is true that the plaintiff must establish a causal relationship between her protected act and the defendant's action against her in both her Title VII retaliation claim and her First Amendment claim, here the defendant has completely failed to address the plaintiff's alleged First Amendment expression. Accordingly, simply by showing there was no issue of material fact as to the causal relationship between the plaintiff's support of Dr. Gaither's Title VII claim and the adverse actions against her, the defendant did *not* also demonstrate that there was no issue of material fact as to the causal connection between her alleged First Amendment expression and her loss of a valuable benefit. Thus, "in fully addressing the Plaintiff's [Title VII] retaliation claim," the defendant did not "necessarily address[] her First Amendment rights claim." This court agrees with the plaintiff that the defendant did not bear its initial burden on a summary judgment motion of demonstrating to the district court that there is no genuine issue of material fact on this cause of action. Accordingly, summary judgment should be denied on this issue.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, it is recommended that the defendant's motion for summary judgment (doc. 47) be granted in part and denied in part.

March 23, 2010  s/William M. Catoe
Greenville, South Carolina  United States Magistrate Judge

16